**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| STEPHEN LANEY, on behalf of himself and others similarly situated, | Civil Action No.: 07-3991 (PGS) |
| Plaintiff, |  |
| v. | **OPINION** |
| AMERICAN STANDARD COMPANIES, INC., |  |
| Defendant. |  |

**SHERIDAN, U.S.D.J.**

Pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), Plaintiff Stephen Laney ("Laney" or "Plaintiff") initiated this putative class action suit against Defendant American Standard Companies, Inc.[1] ("AS") as a result of allegedly defective AS toilets. This matter comes before the Court on three motions: (1) AS's motion for summary judgment on the merits; (2) AS's motion to dismiss based upon spoliation grounds (see infra p. 14 n.6); and (3) Plaintiff's motion for class certification of all persons or entities who purchased a "Champion" model toilet manufactured by AS (Plaintiff seeks a very broad class--"All persons and entities who purchased a 'Champion' model toilet manufactured by Defendant American Standard Companies, Inc., or its subsidiaries or affiliates, in the United States.").

---

[1] American Standard Companies, Inc. has since changed its name to AS Inc.

1

In the complaint, Laney asserts claims for (1) breach of express warranty, (2) breach of implied warranty of merchantability, (3) breach of contract, (4) violations of the New Jersey Consumer Fraud Act ("NJCFA") and (5) unjust enrichment.[2]   To date, there has been discovery including the production of 1.2 million pages of documents by AS.

## I.   STATEMENT OF FACTS

Laney is a resident of Houston, Texas. AS is a Delaware corporation with its corporate headquarters located in Piscataway, New Jersey.  AS manufacturers kitchen and bath fixtures that it sells to wholesalers and retail stores (Home Depot, Lowes); but AS did not sell any to consumers directly.

Sometime in early 2003, AS prepared for the launch of a new Champion toilet (hereinafter the Original Champion Toilet).  This toilet is a two-piece design, which includes a flush tower mechanism instead of the traditional "flapper" flushing system often used in a toilet.  According to Plaintiff, AS launched the Original Champion Toilet to compete with a rival company, Toto, and thus the launch of the product may have been premature due to marketing conditions.  Questions about the reliability of the Original Champion Toilet commenced in advance of the market date.  On March 11, 2003, an AS employee, Dave Hurley, circulated an email discussing risks associated with the Original Champion Toilet launch.  In a chart under a column titled the "Flush Valve," he noted that the flush valve "doesn't work/leaks."  (George Cert. Ex. 11.)

On March 26, 2003, in an email regarding "Champion Risk Issue," an AS engineering

---

[2] Laney's breach of contract claim appears to be duplicative of his breach of express warranty claim. The contract at issue is the AS express warranty.  Since they are identical claims, the court considers them as a single claim and dismisses Plaintiff's breach of contract claim (count III).

manager declared that he "cannot approve of changes [to the Original Champion Toilet] and launches without data." (George Cert. Ex. 13.)

Several months later (June 2003), AS introduced the Original Champion Toilet to the marketplace. The Original Champion Toilet contained a flush tower[3] valve design that included a "dampered" flange that was intended to eliminate noise when the toilet was flushed. This first design also included a flat seal ( "gasket"). This gasket was made of silicone rubber and had a 40 durometer specification (durometer is the measure of hardness of the material). The gasket was also made from a "die cut manufacturing process." A die cut manufacturing process means that the seal was made by cutting multiple circular flat seals from a large sheet of silicone rubber like a cookie cutter.

At the same time, AS issued a limited ten-year warranty, "America's Best Flushing System Ten-Year 'Worry-Free Decade' Limited Warranty." The warranty states in pertinent part:

> For this warranty to become effective, the accompanying warranty registration card and proof of purchase must be completed and returned to the address on the warranty registration card within 30 days of purchase.
>
> If inspection of this American Standard plumbing product, inclusive of china and all mechanical components, within ten years after its initial purchase, confirms that it is defective in materials or workmanship, American Standard will repair or, at its option, exchange the product for a similar model.
> . . .
> This warranty shall be void if the product has been moved from its initial place of installation; if it has been subjected to faulty maintenance, abuse, misuse, accident or other damage; if it was not installed in accordance with American Standard's instructions; or if

---

[3] Although the use of the word "flush tower" connotes a very tall object (Sears Tower, Eiffel Tower, Twin Towers), the flush tower to the contrary stands about 6 inches and fits comfortably within the water storage tank of the toilet.

it has been modified in a manner inconsistent with the product as shipped by American Standard.

This warranty DOES NOT COVER any damage caused by the use of in-tank cleaners.

American Standard's option to repair or exchange the product under this warranty does not cover any labor or other costs of removal or installation, nor shall American Standard be responsible for any other incidental or consequential damages attributable to a product defect or to the repair or exchange of a defective product, all of which are expressly excluded from this warranty. (Some states or provinces do not allow the exclusion or limitation of implied warranties, so this exclusion may not apply to you.)

(Klinger Decl. ¶ 11, Ex. 1.) AS argues that the express warranty is a "repair or replace" warranty. Therefore, AS sends replacement parts or an entirely new toilet tank if necessary at no cost to the consumer. Because the Original Champion Toilet was sold in 2003, the warranty lasts to 2013.

On September 23, 2003, AS issued a "Technical Service Bulletin" memorandum documenting some calls from consumers complaining of internal leaking with the Original Champion Toilet (120 complaints: less than 1% of installed toilets). (Jensen Decl. Ex. 10.) Engineers were instructed to conduct a thorough evaluation of the entire Original Champion Toilet. AS conducted an internal investigation and came up with a variety of factors which may cause internal leaking. These factors included high force being applied during the coupling of the tank to the bowl causing distortion to the flush valve, and that the "sound damper inhibits the seal [gasket]." (Jensen Decl. Ex. 11.)

In October 2003, AS developed a second iteration of the Champion toilet (Champion Toilet 2). In the Champion Toilet 2, the "dampered" flange was removed. A new flush valve was installed in all toilets sold beginning December 2003. On November 21, 2003, an internal AS document titled

4

"Champion Tank Leak Problem" reported on the Champion Toilet 2 that "[w]e will continue to ship product with a known risk of leaking."  (George Cert. Ex. 18.)

On October 10, 2003, AS distributed a "Technical Service Bulletin" memorandum to its wholesalers.  The memorandum states that the "Cause of Leak" is that

> [u]nder random assembly conditions, less than 1% occurrence rate, there is insufficient clearance between the fastener end of the flush valve in the tank and the clearance hole in the bowl then the coupling gasket is compressed to a point that the tank rests on the bowl piers. A secondary cause was traced to the coupling gasket being too stiff which caused the valve sealing joint to leak in some cases.

(George Cert. Ex. 34.)  Moreover, the memorandum states that "[s]ince this is less than a 1% occurrence rate we will continue to ship product.  Once supply for new gaskets is obtained the remaining tank inventory will be refitted with the new gaskets and centering template."  (*Id.*) According to AS, this memorandum demonstrates that it was diligently working to understand the root cause of the leaking problem and to create a solution.

On October 28, 2003, AS released publicly a "Fact Sheet" about all Champion toilets titled "Technology of America's Best™ Flushing System."  This press release described the Champion as follows:

> In a true technological breakthrough, American Standard has reinvented toilet flushing with America's Best Flushing System, installed for the first time in the new Champion toilet.  Extensive hydraulic research and engineering led to a dramatic redesign that virtually eliminates what consumers have long hated about toilets–clogs, overflows, plunging, handle jiggling, wasted water and expensive toilet repairs.  The Champion meets consumer demand for a powerful, maintenance-free toilet that does its work with just one quiet flush.

(Jensen Decl. Ex. 1.)  In December 2003, Michael Friedberger, an AS employee responsible for dealing with qualified assurance issues, distributed a "strictly confidential" email titled "Champion Issues."  The email described the internal leaking from the flush tower into the bowl as "the primary issue for customer complaints."  The email stated that "[a] solution is being implemented for the Champion tank leaking problem which will use a flush tower design which is not dampered for noise reduction."  Mr. Friedberger noted that these flush towers are already being distributed by the customer care department in replacement tanks to all customers with leak complaints.  Within the email Friedberger cautions:

> IT IS CRITICAL THAT THIS CHANGE NOT BE PUBLICIZED TO CUSTOMERS IN ORDER TO AVOID ADVERSE PUBLICITY AND REQUESTS FOR REPLACEMENTS OF INVENTORIES.

(George Cert. Ex. 30 (emphasis in original).)  At oral argument, AS's counsel referred to this email as plaintiff's alleged "smoking gun," but AS proposes that Mr. Friedberger's "testimony demonstrates that it was pretty benign.  This was early in the process.  They aren't really sure what it was.  It appeared to be a minor problem.  They were taking immediate corrective action.  And they said, well, let's not tell people there's a big problem because there isn't a big problem, and let's not make people think that anything that they experience is related to this particular issue."  (Apr. 22, 2010 Tr. at 29-30.)

On December 25, 2003, AS issued a "Technical Service Bulletin" memorandum concerning the "Leaking tank to bowl" problem.  The memo stated: "[w]e have been receiving some complaints of Champion tanks leaking water into the bowl.  We believe it relates to a slight deformation of the valve seat that may have occurred in assembly.  This has been corrected and only a small percent of tanks were affected.  Since there can be variables with regard to the tanks manufactured at different

6

locations it is imperative that the complete tank is replaced." The memo's concluding section reads: "[w]e will arrange for direct shipment of a new replacement tank ASAP and at no charge." (George Cert. Ex. 35.) At oral argument, AS's counsel advised the Court that even though AS referred to the "tank" leaking and sending replacement "tanks," he believed the memorandum intended to refer to replacement flush towers.

Plaintiff deposed Robert Kass, AS's Vice President of Marketing and questioned him regarding an email he sent to Fred Poses, CEO of AS, on December 18, 2003, concerning the leaking problem and complaints to customer service. (*See* George Cert. Ex. 36.) Mr. Kass wrote: "To fix the leaking we decided to go back to the flush tower that is slightly noisier but will solve the leakers until we can redesign a quieter flush tower. We are currently sending out replacement tanks with the new flush towers to fix any complaints. As of January 1 [2004] all Champions (including the new normal height models) will be shipped with the new flush towers." (*Id.*) At the end of the email, Mr. Kass wrote: "As is our practice, we have not divulged nor offered any explanations outside the company that imply any broad Champion problems. All we are saying to anyone who requires a replacement tank is that these new tanks will absolutely fix their leaking problems." (*Id.*) Plaintiff alleges that Mr. Kass's deposition testimony demonstrates that AS's policy was to not inform consumers of the internal leaking:

> Q.  And you say, "As is our practice, we have not divulged nor offered any explanations outside the company that imply any broad Champion problems." Why not? Why not offer any explanations outside the company?
> A.  Because we didn't know that there was a broad Champion problem, there was no reason to hypothesize outside the company.
> Q.  At the beginning of that paragraph, you say, "back in July we did not know about any broader field issue."
> A.  Uh-hum.

Q. Didn't it become a broader field issue?
A. As time went on, we heard of more instances, yeah.
Q. Wasn't it a broader field issue?
A. I mean, yes. I mean, that's what I said.
Q. So why didn't you offer any explanations about this broader field issue outside of the company?
A. We would never–there's no reason to–if someone calls with an issue–this is how I imagine customer care would handle anything–we help the person with their problem and deal with it and help them out, whether–you know, whatever we can do to make it right. There's no reason to expand and–it would be inappropriate.

(George Cert. Ex. 9 at 148:3-149:14.) Plaintiff also deposed AS's corporate representative, Ken Klinger. In 2003, at the time of the Champion launch, Mr. Klinger was director of customer care. At his deposition, Plaintiff's counsel asked him whether AS ever unilaterally contacted consumers regarding the Champion toilet:

Q. Did you ever contact customers who called in before to tell them about a new part that was available?
A. No.
Q. So it was always the case that the customer had to call with the problem in order to get the part?
A. Correct.
Q. So there was never a time when American Standard said we should make this available to everyone and call everyone in our database to see if they need it?
A. There never was that time.

(George Cert. Ex. 12 at 48:23-49:10.)

In Spring 2004, AS issued the third version of the flat seal for the Champion toilet (Champion Toilet 3). AS changed the engineering process of the gasket from a "die cut" method to a "compression molding" process for producing the flat seal. Under a compression molding process, a mold is built containing cavities in the shape of the seal, and then rubber is forced into the mold to create the seal.

8

On October 28, 2004, AS presented internally a forum about the "Gasket Issue." It discussed the seal coming off the groove, the consumer complaints that began in September 2004, the durometer level of the seal, and presented solutions to the groove problem. It also evaluated the "stress" tests that AS conducted to examine the problem.

In November 2004, AS altered the Champion toilet for a fourth time (Champion Toilet 4). Specifically, AS altered the design specifications for the flat seal. First, it changed the manufacturing process back to the "die cut" process from the "compression molding" method. Second, AS changed the flat seal design by reducing its water absorption quality. By reducing the water absorption of the flat seal, it is less likely to leak. Third, it changed the durometer specification for the flat seal from 40 durometer to 50 durometer, in order to prevent the flat seal from dislodging from its groove in the float.

On December 6, 2004, Michael Friedberger emailed that the complaints regarding the leaking "dampered" flush towers were declining; but complaints regarding the seal coming out of the groove were escalating. He states that the latter was "virtually unheard of before August 2004." (Jensen Decl. Ex. 15.)

In late 2004 and early January 2005, after seeing favorable reviews of the toilets on the internet, Laney purchased five AS Champion toilets at a Home Depot in Houston, Texas for his new house; but no one revealed whether they were the Original or Champion Toilet 2, 3 or 4.

On March 25, 2005, Mr. Friedberger disseminated a chart labeled "Champion Quality Issues," and identified numerous issues including the "Tower seal out of groove" and "Leaking flush tower." (George Cert. Ex. 10.)

In May 2005, Laney moved into his new house, where the Champion toilets he previously purchased were installed.

In July 2005, Mr. Friedberger transmitted a document titled "Analysis of Champion Customer Complaints through June 30, 2005." Wherein, he acknowledged that the two ongoing problems are the seals disengaging from the grooves, and broken flush towers. (George Cert. Ex. 19.)

On July 5, 2005, AS completed a "Champion Recent Purchaser Survey." (Soos Cert. Ex. 1.) It concluded that over 80% of consumers were "very satisfied" with their Champion toilet. About 10% were dissatisfied or had some problems. The survey also determined that one-third of recent Champion buyers had reported a problem with their Champion toilet, but most of the problems were resolved. The survey found that "[a] majority of the problems were flushing-related, involving the handle/chain or flush tower performance. Other, less frequently mentioned problems included leakage, the noise of the flush or the 'clunk' of the closing flush tower." (*Id.* at AS0020825.) The Champion toilet also won accolades from *Consumer Digest*, *Popular Science*, and *Building Products* for its innovative flushing system. (*Id.* Ex. 2.)

In Plaintiff's complaint, he reproduces as examples several online complaints from "dissatisfied customers:"

> bought 2 [sic] champion toilets and both have leaked for a long time. We have to run the water valve on every time you want to flush because the red gasket comes off on almost every flush. Finally called AS today because no where we looked carried replacement parts, they said they would send us new gaskets but still I'm out plumber bills) said I should receive in 7 to 12 business days. They acted so surprised like I was the first one to call. I can't afford to go buy 2 new toilets after paying for these but wish I could but guess I will still be out for the plumber. This toilet [expletive]!!

10

\*     \*     \*

my wife and I [sic] just built our dream home and decided to install the champion toilet because the commercial show it flushing down golf balls.  we [sic] thought, wow, this is the toilet for our master bathroom.  needless [sic] to say after a year it has begun to leak at the red gasket.  we went to Lowes today to see if they had a replacement part.  No they don't.  we [sic] may in the near future just replace it with some other toilet.  in [sic] the men time we just keep taking the lid off and trying to get that damn gasket seated properly.  HELP!

\*     \*     \*

I'm another American Standard Champion owner whose flush valve is malfunctioning.  Based on the pictures and descriptions posted here I have the new style gasket.  The darned thing started off seemingly working fine.  Then we started hearing it refill.  The timing varies but sometimes at night when it's keeping me awake it refills as often as very ten minutes.  However the refill cycle time varies considerably, apparently as a result how well the seal sets after a flush.  I've made sure that it is the source of the leak.  And I've tried to identify what the problem is by taking the trip lever and the refill tube off to make sure they weren't keeping the flush valve seal from seating properly.  I've removed the flush valve seal, inspected it and turned it over even though it was in perfect condition.  I'm trying to located a new seal although I don't think it will help.  Frankly after looking at the flush valve seal configuration I think it's a poor design.  I'd bed it is leaking around the flush valve assembly which has very little contact area with the seal.  American (non) Standard needs to address this issue and fix the seal problem.  I'm getting tired of turning off the water supply after each use.

(Compl. ¶ 11.) Plaintiff argues that these complaints only reflect a small amount of consumer frustration and dissatisfaction with AS.  However, AS argues that the vast majority of consumers are very satisfied with the Champion toilet.  AS provided to the Court many of the positive consumer testimonials it received.  A few are reproduced here:

11

> WOW!  I cannot adequately express my consumer glee over this terrific innovation of yours' it's made our lives SO much better . . . It just flushes. Always. Every time. No matter what. It just flushes. Whoosh.  A sound to bring joy to a tire mother's heart and peace to her soul. Whoosh. Not whoosh-splutter-drip-"MOM!". Just whoosh . . . We brag about it.  We tell family members and the occasion DIY homeowning acquaintance to wait until they're back in stock and not to buy anything else.
>
> *       *       *
>
> One week ago I bought and installed a Champion toilet in our first floor half bath.  It replaced an OLD water guzzler that always needed 2 flushes just on general principle.  The Champion is amazing!!!  It is everything I have read about it.  We are now saving water and expect to have no clogs, and it is very quiet.  We will be buying one for the main bathroom soon.

(Soos. Ex. 3.)

In September 2005, AS Flash Reports begin.  The purpose of a Flash Report is to keep AS management up to date on all quality issues encountered by customer care, sales, and field inspection units.  The Flash Reports tracked complaints about all AS products, but the Champion toilet was the most prominent.[4]

The September 2005 Flash Report indicated that the seal out of groove was the largest complaint regarding the Champion toilet.  (George Cert. Ex. 20.) The October 2005 Flash Report stated that "flush tower issue continue to trend upwards."  (*Id.* Ex. 21.)

In autumn of 2005, Laney noticed that one of the Champion toilets in his home would constantly run, and that water was leaking from the toilet tank into toilet bowl, which wasted water. Laney alleges that he lifted the top of the toilet and noticed that the gasket had come out of the groove, which he then reset into its place.  However, the gasket continued to come out of place,

---

[4]  For example, 3421 recorded complaints in January 2006.

Approximately six months later, on or about May 2006, Laney called the customer service department and AS immediately forwarded a replacement flush tower.

The December 2005 Flash Report noted that the flush tower seal continually dislodging out of its groove was the most significant complaint. (*Id.* Ex. 22.)  The February 2006 Flash Report noted that the amount of Champion complaints has decreased since July 2005. (*Id.* Ex. 24.) In March 2006, the Flash Report stated that complaints regarding Champion toilets has decreased to 9.32% of units sold. (*Id.* Ex. 25.)

The May 2006 Flash Reports compared Champion complaints over an 11-month period. (*Id.* Ex. 26.)  The category of complaints included Flush Tower Seal Out of Groove, Broken Flush Tower, Leak Flush Valve, Unidentified Defects, Broken Trip Lever, Tank to Bowl Connection, and Flush Towers Sticking Open.  The Flush Tower Seal Out of Groove complaints were the lowest ever, while it appears the Broken Flush Tower complaints were higher; however, the complaints for Flush Tower Seal Out of Groove and Broken Flush Tower were also significantly higher than any other complaint category.

In July 2006, the Flash Report compared Champion complaints over a 13-month time period. It concluded that Flush Tower Seal Out of Groove and Broken Flush Tower complaints remained fairly consistent since May 2006; but the failure rate over the 13-month period averaged 9 percent. (George Cert. Ex. 27.)

The April 2007 Flash Report noted that overall Champion complaints were trending downward.  Call complaints were reduced by 50 percent.  (*Id.* Ex. 28.) Also, it noted that a newly designed toilet marketed as the Champion 4 began shipping in the last two weeks of April 2007. (*Id.*) The Champion 4 toilet entirely replaced the previous Champion toilets, which Laney purchased.

In June 2007, Laney complained again to AS about two leaking toilets.  As a result, AS forwarded five (5) new flush valves for all of the toilets in Laney's new house.  These were Champion 4 components.  At that time, AS did not require an inspection of Laney's toilets as a condition to sending the replacement flush towers.

In August 2007, Laney filed this putative class action.  In the complaint, he seeks reimbursement for the repair costs by a plumber and the cost of water wasted due to the leaking.  Plaintiff contends he wasted about 40,000 gallons of water in a year.  Laney submits his City of Houston water bills from June 15, 2007 to March 18, 2008.[5]  Laney's total water cost over that time period was $412.72; but there is no calculation as to what part of this cost related to the Champion toilets.  Additionally, Laney submits a check in the amount of $250.00 for "toilet repairs."  (George Cert. Ex. 46.  In September 2007, the AS Flash Report indicated that significantly fewer complaints had been filed about the operation of the Champion 4.

From June 2007 until January 2008, Laney had stored the new flush towers he received from AS in his garage.  In January 2008, Laney installed the five flush towers and they are working smoothly to date.  At that time, Plaintiff disposed of the allegedly defective flush towers, which AS claims should bar the suit due to spoliation.[6]  Plaintiff admits that he did not experience any

---

[5]  Plaintiff's submits "Water/Waste" invoices from the City of Houston.  The invoices are divided into "water" and "sewer" costs.  The total "water" costs are as follows:  June 15, 2007 ($51.75), July 18, 2007 ($41.87), August 17, 2007 ($28.71), September 18, 2007 ($41.87), October 17, 2007 ($46.81), November 19, 2007 ($46.81), December 18, 2007 ($71.51), January 17, 2008 ($28.71), February 18, 2008 ($28.71), March 18, 2008 ($25.97). (George Cert. Ex. 46.)

[6]  The motion to dismiss due to spoliation is far-fetched.  According to AS, Laney discarded two defective flush towers after filing this lawsuit.  AS fails to consider that for over two years it had the opportunity to request an inspection of flush towers based upon 43,741 calls it received, but AS failed to inspect any of them.  Similarly, Laney had made several calls to AS prior to filing suit, but no request for inspection was made.  Spoliation is an equitable remedy.

difficulties with the other three Champion toilets he owned.  Pursuant to federal law the maximum

water use for a toilet is 1.6 gallons per flush.  42 U.S.C. 6295(k).  Plaintiff alleges that the Champion

toilet was losing up to "three extra flushes" worth of water per day or 4.8 gallons per day (1.6 x 3)

per toilet.  (4/22/2010 Tr. 60:7-8.)

AS argues that Laney misrepresents the customer complaints and the perception of the

Champion toilet in the marketplace.  AS states that from the launch of the Champion line through the

end of 2007, AS sold 745,012 Champion toilets.  During that time period, AS received 89,110

customer service calls, which constitutes about 12% of sales.  However, according to AS, many of

those calls concerned unrelated issues to the design defects alleged by Laney, for example, missing

parts or broken porcelain.  AS argues that as far as it can tell, "only 43,741 of those calls–a number

representing just 5.87% of retail sales–arguable related to the malfunction that Plaintiff alleges (i.e.,

calls relating to a "flush tower seal out of groove" or a "leaky flush valve/tower")."  (AS Opp. Br.

Class Cert. 26-27.)  While AS presents these figures to demonstrate the small amount of consumers

who complained to customer service, AS also argues that the figures "overstate" the number of

complaints by consumers because there were multiple calls concerning the same toilet and each call

was counted as a separate complaint.

Despite Laney's demand for payment of plumber costs, AS asserts and Plaintiff agrees that

he  never requested that AS reimburse him for any repair costs.  AS argues that it never obligated

itself to reimburse repair costs within the warranty; however, its practice is to pay for such costs when

---

Nothing here gives rise to such equitable relief.  *See, e.g*, *Schmid v. Milwaukee Elec. Tool Corp.,*
13 F.3d 76, 79 (3d Cir. 1994).   Moreover, Laney alleges a design defect in the Champion toilet;
not a manufacturing defect that is specific to only his toilet.  *Id.*  Thus, Defendant's motion to
dismiss based upon spoliation is dismissed.

a consumer requests it.  At oral argument, AS asserted that if Plaintiff had requested reimbursement of plumbing costs or water costs to the customer service department, Laney would have been paid.

## II.    MOTION FOR SUMMARY JUDGMENT

AS moves for summary judgment on all counts in the complaint.  For the reasons stated below, the Court grants in part and denies in part defendant's motion.

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact, and that the evidence establishes the movant's entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A genuine issue of fact exists only if a reasonable jury could return a verdict for the non-movant, and it is material only if it may affect the outcome of the suit based upon substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

After the movant has satisfied this burden, the non-moving party must establish that a genuine issue of material fact exists.  *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).  Rather, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 247-48.

16

A.      Laney's Express Warranty, Implied Warranty, and Unjust Enrichment claims

AS argues that it is entitled to summary judgment regarding Laney's breach of express warranty claim (count I) because the undisputed facts demonstrate that AS complied with Laney's requests pursuant to the limited warranty.

According to the facts, Laney called AS's customer service department twice.  The first time was in May 2006 when Laney called AS and complained that one of his five Champion toilets was leaking.  AS provided Laney with a new flush tower for that toilet.  The second time was in June 2007 when Laney called to report that two of his five Champion toilets were leaking.  AS responded by sending Laney five replacement flush towers one for each toilet.  After Plaintiff installed the five new flush towers (January 2008) no internal leaking in any of the toilets has occurred.  Additionally, Laney did not request entirely new toilets, and he was satisfied with replacement flush towers.  As such, Laney did not make any requests to AS which was denied.

The warranty is a "repair or replace" warranty.  In another case concerning automobiles, the court described these types of warranties as:  "these warranties do not constitute representations by Ford that the vehicles were 'defect free' when sold.  On the contrary, these warranties acknowledge the possibility of defects in factory-supplied materials or workmanship and promise that if such a defect manifests itself under normal use during the warranty coverage period, Ford will repair, replace or adjust the defective part at no cost to the owner of the vehicle." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 1999 WL 33495352, at *6 (D.N.J. 1999).

Laney's arguments underlying its breach of express warranty claim lack merit.  First, Laney argues that the express warranty required an inspection prior to repair or replacement.  According to Laney, since AS never inspected his toilets prior to sending replacement parts the express warranty

17

was breached.  This argument does not apply in this case.  A plain reading of the warranty demonstrates that repair or replacement will occur "if inspection . . . confirms that it is defective." The clause is included for the protection of the seller not a right being afforded to a consumer.  Here, AS delivered replacement flush towers in compliance with the replacement warranty.  Ordinarily, consumers would be pleased to have replacement parts automatically sent without a requirement that the company first inspect the defect.  *See, e.g.*, *Waukesha Foundry, Inc. v. Industrial Engineering, Inc.,* 91 F.3d 1002, 1004 (7th Cir. 1996).

Laney also presents an unconscionability argument.  He argues that the express warranty was breached because "the evidence suggests that the defect that causes leaking remains and will manifest itself again," without the consumer ever knowing fo the defect even though he concedes that he "has not experienced the leaking problem since he installed the replacement towers early 2008."  This appears to be  a latent defect argument.  In essence, Laney argues that AS knew its Champion toilets had a latent defect at the time of sale and AS did nothing to disclose it to consumers.  *See Payne v. Fujifilm U.S.A., Inc.*, 2007 WL 4591281, at *4 (D.N.J. Dec. 28, 2007).  This case does not fit into the latent defect category as ruled upon in other cases.  Other cases concerning unconscionability and latent defects, are distinguishable from the instant case.  *Id.*  In *Payne*, the court concluded that the manufacturer was aware of a latent defect, concealed the defect, and knew that it would manifest itself after the one-year warranty expired. In *Payne* the plaintiff's warranty expired before the defect manifested itself.  Likewise, in other similar cases, plaintiffs alleged unconscionability where the defect manifested itself after the warranty had expired, leaving the plaintiff without a remedy.  *See, e.g.*, *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 616 (3d Cir. 1995); *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d. Cir. 1986); *Maniscalco v. Brothers Int'l Corp.*

18

*(USA),* 627 F. Supp. 2d 494, 499-500 (D.N.J. 2009). In all these cases, the consumers brought suit where the defect manifested after the warranty expired. In *Duquesne*, *Abraham*, and *Maniscalco*, the consumers alleged that the manufacturers knew that the latent defect existed and purposefully limited the warranty period so that the defect would most likely not occur until the warranty period expired. In *Maniscalco*, the court determined that plaintiffs adequately alleged that defendant "limited the warranty coverage so that the MFC machines would last longer than the warranty period but that the machine head would not last as long as the product's expected useful life." 627 F. Supp. 2d at 502. Laney's circumstances do not fall into this category. AS issued a ten-year limited warranty, which is still in effect for any consumer who purchased an Original Champion Toilet, or 2, 3 or 4 remakes. (including Laney). Here, the warranty limit is very different. It lasts a decade. In this case, the consumers are unlike those in *Maniscalco* because the warranty expires after ten (10) years rather than ninety (90) days. Laney's warranty will not expire until sometime in 2015. AS cannot be held liable under the express warranty where the warranty is still in effect and the company has previously resolved the defect. Plaintiff argues that AS failed to disclose the flush tower problem to prospective customers from 2003 onward (*see* Op. at p. 5 (Friedberger memo)), but despite same, AS provided a reasonable warranty period to seek a remedy.

Additionally, Laney alleges that inadequate customer service constitutes a breach of the express warranty. However, Laney's specific circumstances reflect otherwise–he was sent replacement parts each time he called customer service, he was treated reasonably by customer service, and his toilets have been repaired, albeit that it took two repairs. AS's response is reasonable. Moreover, Laney argues that AS has a "secret warranty" program whereby AS would reimburse consumers for costs, such as plumbing and water, only if the consumer asked for reimbursement. But

the express warranty specifically disclaims all reimbursement costs. The Warranty emphatically states AS "does not cover any labor or other costs . . . nor . . . other incidental or consequential damages." Accordingly, AS was not obligated to reimburse consumers for these costs under the warranty. *See Demorato v. Carver Boat Corp.,* 304 F.App'x 100, 102 (3d Cir. 2008) (citing *Chatlos Sys. v. Nat'l Cash Register*, 635 F.2d 1081, 1085 (3d Cir.1980)). Laney concedes that he never requested any reimbursement from AS. Simply because AS sometimes chose to reimburse costs beyond the express warranty, such voluntary action does not create an obligation upon AS where it did not exist. *Id.* Based on the above Laney's claim for a breach of the express warranty is dismissed.

Laney alleges that AS violated an implied warranty of merchantability. On such a claim, Plaintiff must prove "(1) that a merchant sold goods, (2) which were not 'merchantable' at the time of sale, (3) injury and damages to the plaintiff or its property, (4) which were was caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury." *In re Samsung Electronics Am., Inc. Blu-Ray Class Action Litig.*, 2008 WL 5451024, at *5-6 (D.N.J. Dec. 31, 2008) (citing *In re Ford Motor Co. E-350 Van Products Liability Litig.*, 2008 WL 4126264, at *19 (D.N.J. Sept.2, 2008); *see also Nelson v. Xacta 3000 Inc,.* 2010 WL 1931251, at *7-8 (D.N.J. May 12, 2010)

"[I]n order for the implied warranty of merchantability to be breached, the product at issue must have been defective or not fit for the ordinary purpose for which it was intended." *Nelson*, 2010 WL 1931251, at *7-8. "Merchantability does not mean that 'the goods are exactly as the buyer expected, but rather that the goods satisfy a minimum level of quality.'" *Sheris v. Nissan N. Am. Inc.,* 2008 WL 2354908, at *5-*6 (D.N.J. June 3, 2008) (internal citation omitted). In *Sheris,* plaintiff alleged that his vehicle was not "merchantable" because the brake pads were not of the quality

20

required at the time of sale. Additionally, plaintiff alleged that Nissan had knowledge of the defective brake pads at the time of sale and still sold the vehicle.  However, plaintiff drove the car for approximately two years before bringing a claim for a breach of the implied warranty.  The court concluded that the ordinary purpose of a vehicle is to provide safe transportation, which it was clear the vehicle did at the time of sale.  The court relied upon the fact that plaintiff drove the vehicle for two years before complaining about the product defect.  Generally, the implied warranty of merchantability does not guarantee that a product will never fail.  Similarly, only two of Laney's five toilets evidenced internal leaking.  Laney concedes he waited five to six months before installing the second replacement parts.  Further, upon the second repair Laney testified that his toilets flushed properly. (*See* Op. at p.14.)  A toilet should efficiently use water and not waste same by leaking; however, the facts do not demonstrate that Laney's toilets were unfit for their "ordinary purpose," which is to discard waste into the sewer or septic system.  Since the toilets met this purpose, the Court finds Laney's claim for breach of an implied warranty of merchantability is not breached as the Champion toilet disposed of waste properly.

The Court also dismisses Laney's unjust enrichment claim.  The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.  *Assocs. Comm.  Corp. v. Wallia*, 211 N.J. Super. 231, 244, 511 A.2d 709 (App.Div.1986).  Plaintiff must demonstrate that the defendant "received a benefit, and that retention of the benefit without payment therefor would be unjust." *Callano v. Oakwood Park Homes Corp*., 91 N.J.Super. 105, 109, 219 A.2d 332 (App.Div.1966).

Where plaintiff alleges that an express contract governs the parties relationship, unjust enrichment is not an available means of recovery.  *See Moser v. Milner Hotels, Inc.*, 6 N.J. 278, 280

21

(1951)).  Unjust enrichment is a quasi-contractual claim that may only be pursued in the absence of

a valid express contract.  *Harris v. Homecomings Financial Services, Inc./Bank One,* 2010 WL

1645141, at *4 (3d Cir. 2010).  Laney clearly alleges a breach of the express warranty, hence unjust

enrichment is not allowed.

Second, Laney's unjust enrichment claim fails because he did not confer a benefit upon AS.

"[I]t is the plaintiff's (as opposed to a third party's) conferral of a benefit on defendant which forms

the basis of an unjust enrichment claim."  *Eli Lilly and Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 496

(D.N.J. 1998).  A plaintiff must allege a sufficiently direct relationship with the defendant to support

an unjust enrichment the claim. *See Nelson v. Xacta 3000 Inc.,* Civil Action No. 08-5426, 2009 WL

4119176, at *7 (D.N.J. Nov. 24, 2009) (holding that plaintiff's unjust enrichment claims fails because

he purchased the product at a Wal-Mart store, not from defendant);  *Cooper v. Samsung Elec. Am.,*

*Inc.*, No. 07-3853, 2008 WL 4513924, at *10 (D.N.J. Sept.30, 2008) ("[A]lthough [plaintiff] alleges

that Samsung was unjustly enriched through the purchase of the television, there was no relationship

conferring any direct benefit on Samsung through [plaintiff's] purchase, as the purchase was through

a retailer, Ultimate Electronics.");  *Maniscalco,* 627 F. Supp. 2d at 505-06 (dismissing unjust

enrichment claims where plaintiffs conceded that they purchased printers from third-party retail

chain).  Likewise, such a direct relationship does not exist here. Laney purchased his toilets from

Home Depot.  Accordingly, plaintiff's unjust enrichment claim fails as a matter of law.

B.    Laney's NJCFA claim

In relevant part, the NJCFA proscribes:

> The act, use or employment by any person of any unconscionable
> commercial practice, deception, fraud, false pretense, false promise,
> misrepresentation, or the knowing, concealment, suppression, or

> omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate.

N.J.S.A. 56:8-2.  Moreover, "[t]o state a claim under the CFA, a private plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiffs' ascertainable loss." *Dabush v. Mercedes-Benz USA, LLC*, 378 N.J. Super. 105, 114, 874 A.2d 1110 (App. Div. 2005) *cert. denied*, 185 N.J. 265, 883 A.2d 1062.  AS makes two general arguments in moving for summary judgment.  First, AS argues that Laney's consumer fraud claim is limited to the alleged breach of the warranty.  Therefore, Laney cannot satisfy the "unlawful conduct" requirement because there was no underlying breach of warranty.  Second, that Laney cannot demonstrate "ascertainable loss" because AS did not breach the express warranty.  Both of AS's arguments fail.

In the complaint, Laney alleges that "[b]y selling defective Champion toilets and by failing to honor its warranties, Defendant engaged in 'unconscionable commercial practices' within the meaning of N.J.S.A. § 56:8-2 and thus violated the New Jersey Consumer Fraud Act." (Compl. ¶ 41.) The Court does not read Laney's allegations as narrowly as AS suggests.  Laney pleads in the complaint "multiple questions of law or fact that are common to the class."  (*Id.* ¶ 23.)  Several of these reference the consumer fraud claim: "[w]hether Defendant misrepresented the quality of the Champion toilet;" "[w]hether Defendant omitted material information regarding the Champion toilet;" "[w]hether Defendant violated the New Jersey Consumer Fraud Act . . .;" and "[w]hether Defendant's breach of its warranty obligations constitute violations of the New Jersey Consumer Fraud Act . . ." (Compl. ¶ 23e-h.)  Clearly, Laney intended the NJCFA claim to encompass more than a breach of the warranty.

Generally, "[t]he NJCFA creates three categories of unlawful practices: affirmative acts, knowing omissions, and violations of state regulations." *Vukovich v. Haifa*, No. 03-737, 2007 WL 655597, at *9 (D.N.J. Feb. 27, 2007) (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17, 647 A.2d 454 (1994)). Here, the alleged unlawful conduct is that AS knew the Champion toilet suffered from an internal leaking defect and yet continued to sell it to consumers without disclosing it. "[W]hen the alleged consumer fraud consists of an omission, a plaintiff must show that the defendant acted with knowledge, thereby making intent an essential element of the fraud." *Maniscalco,* 627 F. Supp. 2d at 499-500 (citing *Vukovich*, 2007 WL 655597 at *9). "To proceed on a NJCFA claim, the plaintiff was required to show that the defendant knowingly omitted a material fact in advertising or selling the product." *Henderson v. Volvo Cars of N. Am., LLC,* 2010 WL 2925913, at *6 (D.N.J. 2010); *see also McCalley v. Samsung Electronics Am., Inc.* 2008 WL 878402, *7-8 (D.N.J. 2008) (holding that Plaintiff adequately alleged a NJCFA violation where plaintiff alleged that Samsung marketed televisions as "high end" with "high definition picture" where Samsung knew a defect in picture quality existed). "[A]n essential element of a consumer fraud consisting of an act of omission is that a defendants's act be knowing." *Duffy v. Samsung Elecs. Am., Inc.*, Docket No. 06-5259, 2007 WL 703197, at *6 (D.N.J. Mar. 2, 2007).

Here, the record contains sufficient documentary evidence for a fact finder to conclude that AS knew of the internal leaking when it marketed and sold the Champion product. As early as March 2003, months before the Champion was introduced to the marketplace, AS employees circulated an email concerning internal leaking. In September 2003, AS first documented consumer complaints concerning internal leaking. On November 21, 2003 (five months after launching the Champion toilet) an AS document titled "Champion Tank Leak Problem" stated that "[w]e will continue to ship

24

product with a known risk of leaking," because AS determined the leaking occurred in a insignificant number of toilets.  On October 28, 2003, AS released a public "Fact Sheet" about the toilet where it describes the toilet as "America's Best Flushing System."  The press release states that the toilet "virtually eliminates," among other things, "handle jiggling, wasted water and expensive toilet repairs."  In December 2003, an AS employee, Michael Friedberger emailed other AS employees stating that AS was working on a solution to the toilet, and  noting that it was "critical" that the changes to the toilet not be publicized "in order to avoid adverse publicity and requests for replacements of inventories."  AS argues that these statements, among others, were benign in nature, and the intent was not to deceive consumers but aimed at creating a solution.  Whether AS's intent and behavior in marketing and selling the Champion toilet in light of its knowledge of internal leaking violated the NJCFA is ultimately a question for a jury.

Further, AS argues that Plaintiff cannot show an ascertainable loss.  The term "ascertainable" means that the plaintiff must proffer evidence that is "quantifiable and measurable," and not "hypothetical or illusory." *Thiedmann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248, 872 A.2d 783 (2005). Summary judgment  should only be entered in favor of the defendant in a NJCFA claim when "a plaintiff fails to produce evidence from which a finder of fact could find or infer that a plaintiff suffered a quantifiable or otherwise measurable loss as a result of the alleged CFA unlawful practice." *Id.* at 238.  Laney has produced proof of a $250 payment for "toilet repair" as well as his water invoices from the City of Houston.  He alleges that the internal leaking caused approximately 40,000 gallons of wasted water.  A fact finder could reasonably infer that Plaintiff suffered a "quantifiable or otherwise measurable loss" based upon the documentary evidence.  Therefore, the Court denies summary judgment as to Laney's NJCFA claim.

For the foregoing reasons the Court grants summary judgment as to counts I, II, III, and V; summary judgment is denied as to count IV.

## III.   MOTION FOR CLASS CERTIFICATION

Laney's sole remaining claim after summary judgment is for violations of the NJCFA. Therefore, the Court will consider only whether Laney may certify a class based upon his NJCFA allegations.

The federal class certification standards are well established. A party seeking class certification bears the burden of proving that the proposed class action satisfies the requirements of Rule 23. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir.2008); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183-84 (3d Cir. 2001). To meet this burden, Plaintiff must satisfy the four prerequisites of Rule 23(a) and show that the action can be maintained under at least one of the three Rule 23(b) subcategories. *See In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d at 309 n.6; *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 452 (D.N.J. 1998).

Pursuant to Rule 23(a), a plaintiff must satisfy all four of the following requirements:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Additionally, plaintiff must demonstrate that the putative class meets one of the requirements under Rule 23(b). Here, Laney argues that the class satisfies both 23(b)(2) and (b)(3). Rule 23(b)(2) comes into effect where injunctive relief is requested by a putative class certification. It is satisfied if "the party opposing the class has acted or refused to act on grounds that

apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as whole."  Pursuant to Rule 23(b)(3), an action may be maintained as a class action if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

In the Third Circuit, sometimes the inquiry goes beyond the pleadings at the class certification stage of litigation. "[I]n reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action."  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001).  The Third Circuit has recently emboldened this standard in *In re Hydrogen Peroxide.*  The court held that class certification is proper only after a "rigorous analysis" that all prerequisites of Rule 23 are met.  *In re Hydrogen Peroxide*, 552 F.3d at 309 (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)).  Further, "that the requirements set out in Rule 23 are not mere pleading rules."  *In re Hydrogen Peroxide*, 552 F.3d at 316.  The court expressly directed lower courts that "[t]he decision to certify a class calls for findings by the court, not merely a threshold showing by a party, that each requirement of Rule 23 is met."  *In re Hydrogen Peroxide*, 552 F.3d at 306. Moreover, a court should "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits-including disputes touching on elements of the cause of action." *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 449 (D.N.J. 2009) (quoting *In re Hydrogen Peroxide*, 552 F.3d at 306).[7]  Finally, the burden of proof rests on the movant to establish that all the

---

[7]  This is particularly instructive in the instant case, where plaintiff filed a motion for class certification simultaneously with a motion for summary judgment by defendant.  It is clear that the two motions and the underlying analyses will intersect at times.

requirements of Rule 23 are satisfied.  *In re Hydrogen Peroxide*, 552 F.3d at 316 n.14 (citing *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005)).

The Court will first address Plaintiff's arguments with respect to the Rule 23(b)(2) and(b)(3) requirements.

### A.    Rule 23(b)(2): Injunctive Relief

In order to certify a class pursuant to Rule 23(b)(2) "injunctive or declaratory relief rather than monetary damages must be the primary relief sought."  *Agostino*, 256 F.R.D. at 451 n.5 (citing *Barabin v. Aramark Corp.*, No. 02-8057, 2003 WL 355417, at *2 (3d Cir. Jan. 24, 2003)).  In moving for 23(b)(2) certification, Laney seeks an order declaring that AS violated the express terms of its warranty.  Additionally, Laney states that the injunctive relief it requests is "to require AS to properly repair or replace their defective Champion toilets, *all* of which are still under warranty."  (Pl. Reply Br. 18.) (emphasis in original).  As Plaintiff concedes, no consumer's warranty has expired as of today's date.  It is not entirely clear what injunctive relief would be available as the warranty is still in effect.  As the record demonstrates, AS has repaired/replaced defective toilets for its consumers under the warranty .  The warranty is in effect until at least 2013 for consumers who purchased the Champion toilet in 2003 when it was first released.  Therefore, any injunctive relief related to the warranty would be premature.  More importantly, based upon the proofs and proceedings to date, monetary damages is the main relief sought.  Where monetary damages are sought and the damages are more than simply incidental to the primary claim for injunctive relief, then class certification pursuant to Rule 23(b)(2) is inappropriate. *See Barabin*, 2003 WL 355417 at *1.  Laney clearly seeks money damages as his primary relief.  Therefore, the court denies class certification pursuant to Rule 23(b)(2).

### B.       Rule 23(b)(3): Predominance of Issues of Law and Fact

Laney argues that common issues of law and fact predominate for class certification under

Rule 23(b)(3).[8]  Pursuant to Rule 23(b)(3) an action may be maintained as a class action if "the court

finds that the questions of law or fact common to the members of the class predominate over any

questions affecting only individual members, and that a class action is superior to other available

methods for the fair and efficient adjudication of the controversy."  Predominance "'tests whether

proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *In re Hydrogen*

*Peroxide*, 552 F.3d at 311 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

"Clearly, if proof of the essential elements of the cause of action require individual treatment, then

there cannot be a predominance of 'questions of law and fact common to the members of the class.'"

*In re Linerboard Antitrust Litig.*, 305 F.3d 145, 156 (3d Cir. 2002) (quoting Fed. R. Civ. P. 23(b)(3)).

The plaintiff's task is to show that the essential elements of the cause of action are capable of proof

through evidence that is common to the class, rather than evidence unique to each individual class

member.  Thus, the Court looks for common proof.  *In re Hydrogen Peroxide*, 552 F.3d at 311-12.

Where common proof is not available, but instead, separate mini-trials are required, courts have found

that the "staggering problems of logistics thus created" make the case unmanageable as a class action.

*Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977).  Therefore, to satisfy Rule 23(b)(3),

Plaintiff must show that common questions predominate and that a class action is superior.  This is

referred to as Rule 23(b)(3)'s "twin requirements" of "predominance and superiority."  *In re*

*Hydrogen Peroxide*, 552 F.3d at 310.

---

[8]  While the predominance issue for Rule 23(b)(3) overlaps with the issue of commonality
pursuant to Rule 23(a), courts have found that predominance, while similar to commonality, is a
more difficult burden to demonstrate.  *See In re Hydrogen Peroxide,* 552 F.3d at 310-11.

### 1.      Predominance of Issues of Fact

Plaintiff fails to demonstrate that common issues of fact predominate over the individual facts of prospective class members.  Plaintiff requests that the class to be defined as "[a]ll persons and entities who purchased a 'Champion' model toilet manufactured by Defendant American Standard Companies, Inc., or its subsidiaries or affiliates, in the United States."  AS argues that, *inter alia*, the following common factual issues do not predominate: (1) whether the Champion toilet purchased by a class member actually contained a flush tower of the defective design because not all Champion toilets sold contained the same design; (2) whether or not each individual class member's toilet suffered internal leaking; (3) if the toilet did manifest internal leaking, whether it was the result of an alleged defect in the flush tower, or as a result of the other causes of internal leaking; (4) for plaintiff's warranty claims, each individual member would need to show whether they provided AS with notice of a problem with their Champion toilet, and whether AS repaired or replaced the defective product as required under the warranty.

AS released at least four different versions of the flush tower each with modifications or enhancements.  (*See id.* 24; Jensen Decl. ¶¶ 22-55, Exs. 8-19; Preston Report ¶¶ 17-30; *see also* Klinger Decl. ¶ 16; Friedberger Decl ¶ 31.)[9]  Laney argues that none of these modifications entirely resolved the defect and that "all flush towers are likely to leak, whether or not discovered by the user." (Pl. Reply Br. Class Cert. 4.)  AS asserts that each flush tower was "materially different from each other in terms of the likelihood that they would cause internal leaking."  (AS Opp. Br. Class Cert. 24.)

---

[9] In Plaintiff's brief supporting class certification, Laney alleges that "AS manufactured six different versions of the Champion flush valve in the four years it was on the market.  In 2007, AS scrapped the valve entirely."  (Pl. Br. Class Cert. 8.)  Thus, it is not contested that there exist at least four if not more versions of the Champion flush tower.  Additionally, Plaintiffs' concede that the valve in question is no longer used by the Champion series toilets.

Plaintiff must be able to provide evidence that the original Champion and the iterations were defective. For example, each iteration of the flush tower may have leaked differently, which would affect each plaintiff's ability to recover damages. Also, for some prospective plaintiffs, the Champion toilets with the alleged defect never leaked at all (for example, three of Laney's five Champion toilets).

More importantly, it is not possible to determine whether a prospective class member's toilet contained any of the alleged defects Plaintiff describes. In Plaintiff's brief for class certification, he describes two "last-minute" changes to the Champion flush tower prior to its launch. (Pl. Br. Class Cert. 8-10.) First, to counter a loud "pop" that occurred when the Champion toilet flushed, AS "added a plastic flange or lip just above the gasket, and changed the gasket seal material." (*Id.* 9) As to the "gasket seal," Plaintiff alleges that "[i]n redesigning the gasket to absorb sound, AS chose a material that also absorbed water: it would gradually swell until it would no longer fully seal after a flush." (*Id.*)

However, in October 2003, a few months after introducing the Champion line, AS eliminated the noise-dampering flange that Laney argues was one of the two alleged defects. (*See* AS Opp. Br. 9, 24; *see also* Preston Report ¶ 21.). Additionally, in November 2004, AS reversed the other design change on the gasket seal, replacing the softer seal for the original harder seal. (*Id.*) Thus, relatively few Champion toilets sold during the class period would contain both allegedly defective features. Additionally, many Champion toilets would contain neither feature. AS argues that it would be impossible to determine which individual class members had the version of the flush tower that contained the defective features. Because AS sells Champion toilets to Home Depot, Lowes, and wholesalers, it would be impossible to determine which toilets the intermediary sellers would have

sold to consumers.  In order to determine whether a prospective class member's toilet contained the two alleged defects, or one of the later iterations of the Champion toilet, would require an individualized inquiry into each class member's circumstances.

Next, Laney cannot demonstrate that each class member's product manifested the actual defect. "In most jurisdictions, the courts recognize that unless a product actually manifests the alleged defect, no cause of action for breach of express or implied warranty or fraud is actionable." *Chin v. Chrysler Corp.*, 182 F.R.D. at 460 (citing *In re General Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F.Supp. 1525 (E.D.Mo.1997)); *accord Payne v. FujiFilm U.S.A., Inc.,* Civil Action No. 07-385, 2010 WL 2342388, at *3 (D.N.J. May 28, 2010) ("Where plaintiffs' claims are all based on an alleged common product defect, courts in this District have recognized that even the basic issue of whether the common defect exists may defeat predominance and render the class action unmanageable.")*; In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 342 (D.N.J. 1997) (concluding that "[o]n each of plaintiff's causes of action, the question whether the ignition switches in plaintiff's vehicles are defective is vital to plaintiffs' attempts to establish liability"); *Hubbard v. General Motors Corp.*, 1996 WL 274018, at *3 (S.D.N.Y.1996) (holding plaintiff must allege defect manifested itself in his or her product to state claim for relief); *Barbarin v. General Motors Corp.*, 1993 WL 765821, at *3 (D.D.C. 1993)  (dismissing claims of plaintiffs whose cars had not manifested defect); *Yost v. General Motors Corp.*, 651 F.Supp. 656, 657 (D.N.J.1986)  (holding that a design defect likely to cause damage not actionable); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F.Supp. 595, 603 (S.D.N.Y.1982) (holding no cause of action existed for defect that never manifests itself)).

In *Ford Ignition Switch* the court noted that where the issue of defect may be dependent on

32

the individualized facts of each plaintiff then "common issues will not predominate" over the individualized facts. 174 F.R.D. at 344. Here, neither party disputes the fact that not all Champion toilets manifest internal leaking as a result of the alleged defect. Laney himself asserts that he purchased five Champion line toilets, and only two of the five evidenced any internal leaking. Pursuant to the warranty, AS sent Laney replacement parts for those three toilets even though they never evidenced leaking, and to date have worked well. AS argues that "it would not be possible to prove that every Champion toilet manifested internal leaking–either through common or individualized evidence–for the simple reason that it is not true." (AS Opp'n Br. Class Cert. 26.) This directly affects Plaintiff's ability to prove common injury among the putative class members. In order to establish injury and damages, the court would need to be presented with individualized experiences concerning each class member's circumstances.

For these reasons, the Court concludes that there does not exist a predominance of common facts pursuant to Rule 23(b)(3).

### 2.   Predominance of Issues of Law

Plaintiff argues that New Jersey law (the forum where AS is headquartered) applies to all claims of the putative members of the class. In opposition, AS argues that in this type of case the court should apply the law of each individual's home state to each claim. For the reasons stated below the Court finds that New Jersey law does not apply.

It is a well-settled principle that "[p]rospective class members have a due process right to have their claims governed by the state law applicable to their dispute." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821-23 (1985). Moreover, where a federal court exercises diversity jurisdiction, it must apply the forum state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487,

496 (1941); *accord Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 460 (D.N.J. 2009) (citing

*Gen. Star Nat. Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377, 379 (3d Cir. 1992)).

      In *Phillips*, the Supreme Court held that a court "may not take a transaction with little or no

relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement

that there be a common question of law."  472 U.S. at 821.  In the Third Circuit, a court "must apply

an individualized choice of law analysis to each of plaintiff's claims."  *Georgine v. Amchem Products,*

*Inc.,* 83 F.3d 610. 627 (3d Cir. 1996) (citing *Phillips*, 472 U.S. at 823); *see also In re School Asbestos*

*Litig.*, 789 F.2d 996, 1007 (3d Cir. 1986) ("[T]he dictates of state law may not be buried under the

vast expanse of a federal class action.").

      "Attempting to apply the law of a multiplicity of jurisdictions can present problems of

manageability for class certification under Rule 23(b)(3)."  *Powers v. Lycoming Engines*, 328 F.

App'x 121, 127-28 (3d. Cir. 2009) (citing *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1018 (7th

Cir. 2002) ("Because these claims must be adjudicated under the law of so many jurisdictions, a

single nationwide class is not manageable."); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085

(6th Cir. 1996) ("If more than a few of the laws of the fifty states differ, the district judge would face

an impossible task of instructing a jury on the relevant law").  A court must consider "whether

variations in state laws present the types of insuperable obstacles which render class action litigation

unmanageable."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004).   Thus,

in cases where the "applicable law derives from the law of the 50 states, as opposed to a unitary

federal cause of action" it is plaintiff's burden to demonstrate that "class certification does not present

unsurmountable obstacles."  *Chin*, 182 F.R.D. at 457.  Alternatively, Laney does not argue that a

smaller class of putative plaintiffs is appropriate–for example residents of Texas only.[10]  In fact, Laney concedes that "application of the law of each class member's home jurisdiction by this Court would hopelessly complicate the trial process by requiring the jury to consider the differences between the elements necessary to prove consumer fraud in each jurisdiction and the damages that can be awarded to successful claimants."  (Pl. Br. Class Cert. 29.)

New Jersey courts apply "the 'most significant relationship' test enunciated in the Restatement (Second) of Conflict of Laws § 188 (1971).  *Agostino*, 256 F.R.D. at 460 (citing *State Farm Mut. Auto. Ins. Co. v. Simmons' Estate*, 84 N.J. 28, 34 (1980)).[11]  The "most significant relationship" test is a two-pronged approached.  *See id.* at 461.  First, the court must examine the "substance of the potentially applicable laws" to determine if an actual conflict exists.  *Id.*  If there is no conflict, then the court applies the law of the forum state–here New Jersey.  However, if substantive conflict among the laws of different states exist, then the second prong requires the court to evaluate the factors

---

[10]  The *In re Hydrogen Peroxide* court discussed the significance of providing district courts with a "trial plan" that demonstrates how a court may group/address various different or common aspects of law among different states as to various theories of liability or damages.  552 F.3d at 319.  "A plan may be particularly important in this type of nationwide class action following our decision in *In re Hydrogen Peroxide*, where we made clear that 'conditional' certification is no longer acceptable."  *Powers v. Lycoming Engines*, 328 F. App'x at 127-28 (quoting *In re Hydrogen Peroxide*, 552 F.3d at 318-19). While plaintiff argues that the NJCFA must apply, he has not provided the court with an alternative trial plan.  Therefore, there does not appear to be a method to group/address claims in a detailed trial plan as suggested by the *In re Hydrogen Peroxide* court.

[11]  Until recently New Jersey courts applied different choice of law tests depending upon whether a tort or contract claim was asserted.  Contract claims were analyzed under the Second Restatement's significant relationship test; tort claims were analyzed under the "governmental interest" test. Compare *State Farm Mut. Auto. Ins. Co.,* 84 N.J. 28 with *Warriner v. Stanton,* 475 F.3d 497, 500 (3d Cir. 2007) and *Fu v. Fu*, 160 N.J. 108, 118 (1999).  However, the New Jersey Supreme Court in *P.V. v. Camp Jaycee*, 197 N.J. 132 (2008) adopted the "most significant relationships" test for all choice of law disputes going forward.  *See Agostino*, 256 F.R.D. at 461.

enumerated in the Restatement section that corresponds to the type of claim asserted. *Id.* (citing *Camp Jaycee*, 197 N.J. at 143-44). Additionally, the New Jersey Supreme Court has articulated the principles in §6 of the Restatement to be considered: "(1) interstate comity, (2) the interests of the parties, (3) the interests underlying the substantive body of law, (4) the interests of judicial administration, and (5) the competing interests of the states." *Erny v. Estate of Merola*, 171 N.J. 86, 101-02 (2002) (quoting *Fu v. Fu*, 160 N.J. 108, 122 (1999)).

Plaintiff states that New Jersey law applies because "AS is headquartered in Piscataway, New Jersey, and all its operations, including the hub of its corporate exchange server (email and date operations) are centered there." (Pl. Br. Class Cert. 19.) AS designed and tested the prototype Champion toilets in New Jersey where its "core marketing and engineering teams" were located. (*Id.* 20.) While AS actually manufactured all the Champion toilets in Brazil and Mexico, any executive and leadership decisions concerning the Champion toilets were made by employees located in New Jersey. (*Id.*)

Laney argues that New Jersey has "the most significant relationship" with the consumer fraud claims asserted in the complaint. Specifically, Laney alleges that "[b]y selling defective Champion toilets and by failing to honor its warranties, Defendant engaged in 'unconscionable commercial practices' within the meaning of N.J.S.A. § 56:8-2 and thus violated the New Jersey Consumer Fraud Act." (Compl. ¶ 41.) Additionally, Laney argues that facts concerning the express warranty suggest that New Jersey law is applicable. The express warranty issued with each Champion toilet lists the address of AS's Director of Consumer Affairs in Piscataway, New Jersey and directs consumers to mail warranty claims to the New Jersey office. (*Id.*) Customer service was physically located in New Jersey and therefore consumers would call employees in New Jersey for warranty claims. (*Id.*) Laney

takes the position that "[t]he failed design, the false promises, the implied warranty, the creation of the unprecedented 10-year warranty and the warranty service problems all occurred in New Jersey." According to AS, under New Jersey choice of law analysis the Court would be required to apply to each class member's claims the law of his home state. AS argues that under this circuit's law there exists a presumption that each putative plaintiff's state has the most significant interest in litigation when compared to the defendant's state where it is headquartered. (AS Opp'n Br. Class Cert. 14.)

### The New Jersey Consumer Fraud Act

Under the first prong of the "most significant relationship" test, there is little doubt that material conflicts exist between the NJCFA and consumer protection statutes of other states.[12] *See Agostino,* 256 F.R.D. at 461; *Elias v. Ungar's Food Prod., Inc.*, 252 F.R.D. 233, 247 (D.N.J. 2008). The New Jersey Appellate Division has identified several conflicts that exist between the NJCFA and other state consumer fraud statutes:

> New Jersey allows and often encourages private class actions for consumer fraud while several other states prohibit private class action consumer fraud suits. *E.g.*, Miss.Code Ann. § 75-24-15(4); S.C.Code Ann. § 39-5-140(a); Ala.Code § 8-19-10(f). NJ law finds actionable fraud in connection with the sale of goods or services for commercial or business uses, whereas some states "confine their consumer fraud statute remedies to items purchased 'primarily for personal, family or household purposes.' " *Fink,* 365 N.J.Super. at 572, 839 A.2d 942 (citing Mo. Ann. Stat. § 407.025(1); 73 P.S. § 201-9.2; Miss.Code Ann. § 75-24-15(4)). Some states require proof that the defendant willfully or knowingly made false representations "with specific intent to deceive," while New Jersey does not require such a showing. *Fink,*

---

[12] As both parties concede, and many courts have recognized, New Jersey maintains one of the most comprehensive consumer fraud protection statutes in the country. Pursuant to the NJCFA, "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction." N.J.S.A. 56:8-19.

> 365 N.J.Super. at 576, 839 A.2d 942. Furthermore, variations exist in the award of damages, especially the decision or ability of a court to award punitive or treble damages.

*Int'l Union of Operating Engineers Local # 68 Welfare Fund v. Merck & Co., Inc.*, 384 N.J.Super. 275, 294-95 (App. Div. 2006), *rev'd*, 192 N.J. 372 (2007) (holding that nation-wide certification of NJCFA class was inappropriate).[13]  This is not contested, and therefore, an actual conflict of law exists.

The second prong requires that the court evaluate plaintiff's claims under the appropriate section of the Restatement that correlates to the type of action alleged.  For claims sounding in fraud, the court applies § 148.  Pursuant to § 148(1):

> (1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 148(1) (1971).  There is a brewing issue in the Circuit whether to apply the NJCFA to a class action.  *Compare Agostino*, 256 F.R.D. 437 *with In re Mercedes-Benz Tele Aid Contract Litigation*, Civ. No. 07-2720, 2009 WL 1101241 (D.N.J. Apr. 24, 2009).  Recognizing the merits of both, the *Chin* precedent is followed.  *See* 182 F.R.D. 448.

In *Agostino*, plaintiffs alleged a putative class action against Quest Diagnostics, Inc. ("Quest")

---

[13]  As the *Agostino* court noted, "[i]n addition to these conflicts, the requirement of some consumer fraud laws that a plaintiff show ascertainable loss creates another conflict between the NJCFA and the respective consumer protection statutes of other states. In order to bring a claim under the NJCFA, a plaintiff must allege that he has suffered an ascertainable loss as a result of the unfair or deceptive practices alleged." 256 F.R.D. 437, 461-62 (D.N.J. 2009) (citing N.J.S.A. 56:8-19; *Weinberg v. Sprint Corp.*, 173 N.J. 233, 237, 801 A.2d 281 (2002)).

alleging, *inter alia*, that "they have been injured by reason of unconscionable commercial practices, deception, and fraud in connection with [Defendant's] improper billing and debt collection for laboratory services." 256 F.R.D. at 462 (internal citation omitted). Plaintiff's basic allegation was that Quest overcharged laboratory services through false representations on invoices. *Id.* The *Agostino* court applied § 148(1) of the Restatement, noted above. The court held that § 148(1) "recognizes that the state in which a prospective plaintiff acted in reliance on defendant's fraud is presumed to have the predominant relationship to the parties and issues in this litigation." *Id.* The *Agostino* court described the circumstances in that case stating:

> Plaintiffs received the bills and dunning demands in their home states. Those plaintiffs who relied on the bills and paid an amount not due presumably did so by making a payment by check or credit card from their respective home states. And while the purportedly illegal billing practices may have emanated from Quest's home state of New Jersey, they were directed at each plaintiff's home state.

*Id.* at 463. Moreover, the court notes that the actual debt collectors used by Quest were not located in New Jersey. *Id.* Therefore, there was a third party in between Quest and the Plaintiffs. This is similar to the conduct at issue here. AS, like Quest, is headquartered in New Jersey. Additionally, AS sold the Champion toilets to third parties (wholesalers and two retail stores) that are located presumably in the home state for each plaintiff, which then sold the toilets to the plaintiffs. AS did not sell any product from New Jersey directly to putative class members. Moreover, as in *Agostino*, the decisions with regard to the design of the toilet would have emanated from New Jersey. The actual manufacturing, however, did not take place in New Jersey. The *Agostino* court concluded "that there is a strong presumption under Section 148 that the consumer fraud law of each class plaintiff's home state should apply to his respective claim." *Id.* Moreover, the *Agostino* court held that none of

39

the § 6 principles rebuts that strong presumption.[14]

Plaintiff relies on *In re Mercedes-Benz Tele Aid Contract Litigation*, 2009 WL 1101241 (D.N.J. Apr. 24, 2009). The *Mercedes-Benz* court applied § 148(2) in holding that the NJCFA applied to a putative class claim.[15] The *Mercedes-Benz* court held that because Mercedes's headquarters and their marketing team were located in New Jersey, any decisions regarding disclosures emanated from the New Jersey headquarters. The rationale in *Chin* is the appropriate precedent. *See* 182 F.R.D. at 457. The *Chin* court held that "[e]ach Plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws. These interests arise by virtue of each state being the place where Plaintiffs reside, or the place where Plaintiffs bought and used

---

[14] The court held:

> The interests of interstate comity clearly favor the application of the law of each prospective class member's state of residence. *See Fink*, 365 N.J. Super. at 585, 839 A.2d 942. Second, the interests of the parties "is of extreme importance in the field of contracts," but it "plays little or no part in a choice-of-law question in the field of torts." *Fu*, 160 N.J. at 123, 733 A.2d 1133 (quoting *Pfizer, Inc. v. Employers Ins. of Wausau*, 154 N.J. 187, 199, 712 A.2d 634 (1998)). Third, because "[e]ach plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws," the competing interests of the states overlaps with the interests underlying consumer protection law and favors applying the 51 state consumer fraud statutes. *In re Ford Motor Co.*, 174 F.R.D. at 348. The fifth factor does not alter the Court's analysis because the New Jersey Supreme Court has found that the interests of judicial administration factor "must yield to strong state interests implicated by the remaining factors." *Fu*, 160 N.J. at 124, 733 A.2d 1133.

[15] Section148(2) applies "[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made."

their allegedly defective vehicles or the place where Plaintiff's alleged damages occurred." *Id.* Here, each plaintiff experienced problems, if any, with his toilet, installed any replacement parts, and suffered any alleged losses within his home state. Moreover, each respective state's interest in enforcing its consumer fraud laws trumps New Jersey's interest. New Jersey has no interest in compensating residents that live in other states for consumer fraud. The most persuasive reason that Plaintiff proffers as to why New Jersey law should apply is efficiency; however the substantive rights and states' interests in protecting their residents cannot be compromised only for the sake of efficiency. (*Id.*)

The Court applies § 148(1) to the instant case. The warranty was issued in each consumer's home state along with the product at the time of purchase. Like in *Agostino* where the billing documents were sent to each consumer in his home state, the warranty was issued to each consumer in his home state. AS did not sell a product directly to putative class members and the interests of each state are significant in regulating products sold through retail companies in their states to consumers. Here, there is a presumption that each plaintiff's state's laws should apply to their claims.

The allegations in *Cooper v. Samsung Electronics America, Inc.*, were very similar to those here. The court held that

> Cooper, who purchased the television in his home state of Arizona, is not entitled to sue under the New Jersey consumer fraud statute. The transaction in question bears no relationship to New Jersey other than the location of Samsung's headquarters. Cooper's claim bears the most significant relationship with Arizona, the state in which the television was marketed, purchased and used.

*Cooper*, 2010 WL 1220946, at *4. Plaintiff purchased a television that he claimed was marketed as capable of displaying a high-quality video signal known as "HDMI," which he learned afterwards it

41

was incapable of doing.  He alleged both a defect claim and a breach of the one-year Samsung warranty. *Id.* at *1.  In the end, however, the court found he could not rely on the location of Samsung's headquarters to satisfy the choice of law analysis because the other factors were more significant.  *See id.* at 4.

Additionally, the AS warranty notifies consumers that "[s]ome states or provinces do not allow the exclusion or limitation of implied warranties, so this exclusion may not apply to you."  This statement indicates that AS expected the laws of the consumers' states to apply, and gives some notice to consumers of this proposition.[16]

The application of § 6 weighs in favor of applying the consumer fraud law of the various states.  The "interests of interstate comity" and the significant "competing interest" among the states in their consumer fraud statutes favors an application of each class member's state law.  It is not enough to argue that because New Jersey has the strongest consumer fraud protections, it has a more compelling interest in determining the outcome of the case.  Regardless of the broad language of the NJCFA, "[e]ach plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws."  *In re Ford Motor Co.*, 174 F.R.D. at 348.  Other factors, such as judicial administration and efficiency, which Laney relies upon "must yield to strong state interests implicated by the remaining factors." *Fu*, 160 N.J. at 124, 733 A.2d 1133.   The *Chin* court, in rejecting the application of the

---

[16]   Similarly, AS argues that the "reasonable expectations of the parties" weighs against applying New Jersey law.  AS asserts that Laney conceded that he expected Texas law to govern his claims.  During his deposition, when AS's counsel asked Laney what law he thought would apply to his claims he responded with Texas.  (*Id.* 21.)  Laney is a lay person, not an attorney, and most likely never considered such a question, or understood its legal significance.  The Court will give little weight to Laney's statements.

NJCFA, stated that "[w]hile it might be desirable for the sake of efficiency to settle upon one state, such as New Jersey, and apply its law in lieu of the other 49 jurisdictions, due process requires individual consideration of the choice of law issues raised by each class members case before certification." 182 F.R.D. at 457. Here, the individualized considerations demonstrate that common issue of law do not predominate.

The Court concludes that determining liability, injury, and damages would require an excessive and unmanageable amount of individual inquiry. Further, the Court would need to apply the laws of each class member's home state to the consumer fraud claims. These combined issues create "insuperable obstacles" to class certification. *See Kings Choice Neckwear, Inc. v. Fedex Corp. et al.*, No. 07-CV-275, 2009 WL 689718 (D.N.J. Mar. 11, 2009). Because the Court concludes that class certification is not possible under Rule 23(b)(2) or (b)(3) it need not address the Rule 23(a) requirements. *See Chin*, 182 F.R.D. at 453.

### III.  CONCLUSION

Based on the foregoing facts and law:

A.     Defendant's motion for summary judgment is granted as to Counts I, II, III and V and denied as to Count IV;

B.     The motion to dismiss based on spoilation is denied; and

C.     Plaintiff's motion for class certification is denied.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

September 23, 2010